GORETSKI v. AU SABLE & NORTHWESTERN RAILWAY CO.

1. RAILROADS—NEGLIGENCE—CATTLE GUARDS—ANIMALS.
   Evidence that plaintiff's horse when it was struck and killed by defendant's train was near the cattle guard which was placed about 115 feet from a public road, that the road was established in 1873, before enactment of the statute requiring highways to be maintained four rods in width, and by user had been established at a width of 37 feet opposite the cattle guard, that at this point the fence along the highway formed a pocket and crossed the track at some distance from the intersection of the right of way and the line of the road, and that plaintiff's horse wandered into this pocket on defendant's land, and thence onto the track, presented a question for the jury as to the width and location of the highway.

2. SAME—STATUTES—QUESTION OF FACT.
   Whether the cattle guard was properly located and whether defendant had left its tracks and right of way exposed beyond the limits of the road was properly left to the jury under 2 Comp. Laws, § 6294; 3 How. Stat. (2d Ed.) § 6648; *Parker* v. *Railway*, 93 Mich. 607 (53 N. W. 834).

3. SAME.
   It was a question of fact whether or not the guard was as near the highway as practicable.

4. SAME—TRIAL.

> The court properly refused to direct a verdict for defendant whose evidence was contradicted by plaintiff's; and it was proper to submit to the jury the issue as to the position of plaintiff's horse in or outside of the highway when it was killed.

Error to Alcona; Connine, J. Submitted October 14, 1912. (Docket No. 57.) Decided November 8, 1912.

Case by John M. Goretski against the Au Sable & Northwestern Railway Company for the negligent killing of plaintiff's horse. Judgment for plaintiff. Defendant brings error. Affirmed.

*Henry, Henry & Henry*, for appellant.

*Albert W. Black*, for appellee.

STONE, J. This is an action on the case to recover the value of a horse belonging to the plaintiff which was killed at a place where the defendant's railroad crosses a highway in Curtis township, Alcona county, on August 3, 1909. Upon the trial it was conceded by the defendant that the horse was owned by the plaintiff, and that it was killed by being run over by a train operated by the defendant. The plaintiff recovered a verdict and judgment of $100, and the case is here for review upon errors alleged in the trial, and in the refusal to grant a new trial.

We have found some difficulty in understanding the testimony as to the location of the railroad and highway, for want of a proper map. The appended sketch produced from Exhibit B, which was received in evidence without objection, on the trial, will aid somewhat in understanding the situation. The repeated letters "o o o o o o" are supposed to indicate the course taken by the horse to the point where he was killed upon the track.

The alleged negligence upon which the action is based is that the defendant neglected to fence its right of way as provided by the statute. There is no claim that the

fences and cattle guard were not in good condition. The
negligence alleged is that they were not properly located.
At the point in question the railroad does not cross the
highway at right angles, but diagonally. The cattle
guard in question was southerly of a point where the rail-
road crossed the traveled portion of the highway, a dis-
tance of about 114 or 115 feet. There was considerable

conflict in the testimony as to the actual width of the
highway and the highway lines. On the part of the plain-
tiff the testimony tended to show that the point where the
railroad crossed the State road was 115 feet from the cen-
ter of the road to the cattle guard on the south; that there
was no fence for that distance between the State road
property and the cattle guard; that the land on each side
of the railroad for that distance was open on both sides to
the public; that on the south side it was uneven, and on
the north side it was more level; that the railroad track
could have been fenced out to the State road crossing;
that the highway at that point for a little distance ran
almost parallel with the right of way of the railroad; that
the highway was about 30 feet wide; that the northeast
end of the south cattle guard came pretty near to the high-

172 MICH.—40.

way; that it was about 20 feet from the nearest end to the center of the State road—that is if a line were drawn at right angles with the railroad track from the nearest end of the cattle guard, it would be about 20 feet—that after crossing the railroad track the State road bends around southerly, and for some distance runs parallel with the railroad.

One of plaintiff's witnesses on cross-examination testified as follows:

"*Q.* Isn't it a fact that the east end of the cattle guard in question runs out to the highway—the old State road?

"*A.* The east end; yes. It runs right to where it is fenced. As far as it is fenced in.

"*Q.* And isn't it a fact that it is fenced right to the edge of the highway?

"*A.* The highway is fenced right to that cattle guard, and stops right at the cattle guard.

"*Q.* What I say is—isn't that fence or cattle guard right to the edge of the highway, the old State road? Here is your railroad running along here and the highway running along here, isn't it a fact that that cattle guard runs right to the highway?

"*A.* Yes."

One of the plaintiff's witnesses described the killing of the horse as follows:

"I saw Goretski's horse killed. I was working below the railroad in my field when I heard the log train whistle for the crossing. * * * I looked up, and saw this horse standing across the State road with his head south. When I looked again, he was standing right across the middle of the track still facing south, about halfway between the State road crossing and the cattle guard. From there the horse went down into a depression or hole as we called it, on the south side of the railroad, and, when the engine came down, the engineer blew his whistle twice, and then I saw the horse start up the bank, and saw the engine run into it. When the horse was struck by the train, it was as near as it could be to the cattle guard, and not behind the guard."

A stream runs under the track right north of the south cattle guard. It was here conceded that it was about

114½ feet from the crossing proper to the cattle guard.
On cross-examination this witness testified that the horse
was not over 8 or 10 feet away from the cattle guard
when it was struck; that right where the horse was stand-
ing when he first saw it, from fence to fence the highway
was quite wide. It took in that hole or deep depression.
The State road and the railroad and all of it was mixed
in together. He did not know there is any legal width for
a State road. It was an old trail, he understood, that had
been cut there for years for a tote road. Witness had
been there about 17 years, and this road has always been
just as it was when he moved there. On redirect exam-
ination he testified that the used part of the old State road
was wide enough for two wagons; that there was just one
wagon track right there, and it was the track that was
used by people in driving up and down that road; that
there was a narrow strip of land between the railroad
track, the rails and ties of the track, between that and the
used portion of the road, between the road and the rail-
road track; that there was no fence or guard or protection
on either side of the railroad track to keep cattle from
getting on this point of land, and on the railroad track for
the distance of 115 feet back to the cattle guard; that
there was a field fence that set away back, belonging to a
farmer there, that made a kind of a bag there—several
rods from the railroad; that it was between the railroad
track and this fence that this hole or depression was—be-
tween the two fences. Evidence was also produced by
the plaintiff, that, considering these two lines inclosing the
traveled part of the State road and these two lines, the
railroad track, it would not inconvenience the public
travel along this road for some distance if the fence and
cattle guard were moved to a point nearer the crossing
proper; that the fence and cattle guard could be moved
some closer to the crossing, probably 30 or 40 feet; that,
if that were done, the nearest end of the cattle guard
would be pretty close to the highway, within four or five
feet.

On the part of the defendant there was evidence tending to show that at the point in question the State road runs on the railroad right of way over 200 or 300 feet; that at the point opposite the cattle guard the highway was 37 feet wide; that the fenced line of the right of way —that is, the fenced line between the highway and the railroad track—runs right up to and is attached to the cattle guard; that, if the cattle guard were moved closer to the crossing, it would be on the main traveled highway; that from where the fence and cattle guard meet to the center of the highway if 19 feet, it would leave about 15 feet between the cattle guard and the edge of the road in question. There is land there that is not used for driving or track purposes. To the west of the railroad track and to the north of the cattle guard there is a depression. The fence along the railroad track is the railroad fence, and the other is a private fence. As a matter of fact cattle getting in this triangular piece of land from the highway and the State road in question could not get out again except by crossing the railroad track or going out along the fence line to the State road. The State road, as it was called, was put in there in 1873, and the railroad was built in 1891.

"The cattle guard is 14 feet wide, the pit, and they put the cattle guard in here. The section crew in building that cattle guard had this fence come by and alongside the State road, and they measured over the two rods over to that point. Most highways are four rods wide. This is an old State road, and is especially narrower than any other legal road in the State now. They first took this line to where it comes in here, and they put that cattle guard in there because they did not want to encroach on the highway. If they had put it closer, they would have had a very narrow road here, and no team would have had a chance to pass another. * * * The section crew in building that cattle guard put it there because they did not want to encroach on the highway."

The roadmaster of the defendant testified to the same, in substance. On cross-examination he testified as follows:

"*Q.* You own some property along the railroad track, here on this side of the track?

"*A.* I expect so.

"*Q.* Now, then, why could not the fence be built along your line between that right of way and the highway?

"*A.* It is built just about to the nearest point that I built fences then.

"*Q.* The railroad owns some of this land between the crossing proper, and the place where the cattle guard now stands. Why could not the railroad company build the fence along its own land there, and up to a point nearer to this crossing?

"*A.* You might build nearer the grade, but you would have a regular pen there."

The defendant requested the court to charge the jury as follows:

" (1) I charge you, as a matter of law, that if you find that the so-called south cattle guard extends up to the south line or boundary of the highway that your verdict shall be no cause of action.

" (2) I charge you that the facts showing that the so-called south cattle guard does not extend up to the south line or boundary of the highway or State road, so called, are undisputed, and that you are to find such to be the facts.

" (3) I charge you as a matter of law that the undisputed facts show the defendant to have complied with section 6294 of the Compiled Laws of 1897, and therefore your verdict shall be no cause of action."

The above requests were refused, except as covered by the general charge.

The court charged the jury, among other things, as follows:

"Now, the defendant railroad company claims in this case that it has complied with the statutory requirements in regard to the fences and cattle guards. That is their defense—that they have complied with the statutes substantially, and that they had there that day erected and in good order fences and cattle guards that met fully the requirements of the statute. They claim that they had built fences both on the easterly and westerly sides of this railroad, and built a cattle guard at the north side of this highway, and one at the south side of the highway, and proper connecting fences. That is their claim.

"Now, there is no claim here that the fences as built, or the cattle guards as built, were not sufficient. The claim of the plaintiff is that they were not properly located and extended. The claim of the plaintiff is that the railroad fences did not cover the entire right of way outside of the highway. So you see the complaint is not on account of the kind of fence that had been erected there, or the kind of cattle guard, but the complaint is of the location of the fences and the cattle guard.

"Now, this statute requires the fences to be erected at highway crossings up to the line of the highway, to that point where the line of the highway and the line of the railroad right of way meet. It contemplates that railroad tracks shall not be exposed except within the limits of the highway, that outside of the highway they shall be fenced, and that part of the railroad track which is unfenced shall consist only of that part of it which lies within the boundaries of the lines of the highway.

"As I told you before, highways must be left open their full width by everybody, railroads included. So this defendant, the railroad company, need not have fenced into the highway, nor upon any part of the highway, but only up to the line of the highway. So you see it is important for you to determine from the evidence where the line of the highway was, and where the line of the railroad right of way was, and the defendant was required to fence up to that point where those two lines met, but not beyond that.

"So, gentlemen of the jury, if this defendant, the railroad company, fenced up to the line between its own right of way and the highway line, then it has done its full duty, and there can be no recovery in this case. In other words, if the place where this horse was killed was a part of the highway and within the highway lines, there can be no recovery in this case. If the fences and the cattle guards were on the highway line, then the defendant is not liable, and your verdict would be in favor of the defendant, no cause of action. On the other hand, if the defendant, the railroad company, exposed and left unfenced any material or substantial part of its right of way outside of the highway, then it increased the exposure which the public would be liable to, and if it left unfenced any part of its right of way outside of the highway, and if by reason of that the horse was killed, then the defendant would be liable. And it is the duty of the

plaintiff to trace the killing of the horse to the neglect to fence. In other words, the killing of the horse must be, in a degree, and to a certain extent, the consequence of the neglect to fence, if there was any such neglect. The mere fact that the horse was killed there does not of itself give any right of action. The question is, Did the defendant neglect in its duty to fence, and by reason of that was the horse killed? The neglect of duty must be shown upon the part of the defendant. Was the killing of this horse due to the defendant's failure to fence this right of way at the point where it was its duty to fence it, viz.: at the point outside of the highway? If not, there can be no recovery, but if so there may be a recovery."

The defendant made a motion for a new trial for the reasons that the verdict was contrary to law and the evidence; that the question was one of law to be decided by the court, and that the verdict should have been directed for the defendant; that the undisputed evidence established the fact that the cattle guard was built in accordance with the statute, at the junction of the railroad right of way and the public highway, because the undisputed evidence showed the highway to be 37 feet wide at the point where the cattle guard had been constructed, because the undisputed evidence showed that the cattle guard in question had been built up to, and adjoining the highway itself, that the highway is fenced to and runs to the cattle guard; that the cattle guard could not be nearer to the highway without being on, or encroaching on the highway; because the highway was shown to be a State road, and to have been laid out and constructed more than twenty years ago; because the undisputed evidence established the fact that the boundaries of the highway were the fences along either side; because upon the evidence the width of the highway was a matter of law for the court; and because the railroad company could nót be compelled to construct its cattle guard on a highway, or encroach on the highway with its right of way. In its reasons for denying the motion for a new trial the court said in part:

"Much time was spent by counsel in showing the location of the southerly cattle guard, and its relation to, and distance from, the fence and the highway on the easterly side of the railroad track.   I did not regard this as so material and controlling as the distance this guard was from the crossing, and the location and distance of this guard from the fence on the westerly side of the track, and how much territory was left unfenced and exposed there, because the horse got to the point on the right of way, and upon the track where it was struck, immediately from the westerly side of the track.   There was no showing, on either side, how far it was from the outer edge of this guard to the fence along the westerly side of the track; nor whether that fence could have been brought nearer to the railroad track; nor whether the connecting fence on the west side could have been brought nearer to the crossing proper, all without encroaching upon the highway. The horse was killed by reason of the unfenced space on the west of the track, and not by reason of the space left on the east.   As the proofs did not show the dimensions of this unfenced space on the west, and as it appeared that the cattle guard was 114½ feet from the crossing, I think it was an open question whether defendant had extended its westerly line of fence, and its cattle guard up to the highway line, on the westerly side of the track, whether defendant had, on the westerly side of the track, at this point, left uninclosed territory not part of the highway, that should have been inclosed by fences; in other words, whether defendant had on the west constructed its fences upon the highway lines."

Exceptions were duly filed to the refusal to grant a new trial, and the record contains 21 assignments of error. These assignments of error are grouped by counsel for appellant, and urged in the following positions:

(1) That the highway or State road, so called, was, as a matter of law, a legal highway, with its west boundary line, the fence, running between the right of way and highway, and joining with the cattle guard.

(2) As matter of law, if the cattle guard was constructed so that the east end of such guard ran up to the highway and was connected with the fence along the highway, the railroad company had done its duty so

far as concerns the location of the guard, and cannot be held liable for the killing of the horse.

(3) Assuming, but not conceding, the rule to be that, in case of a diagonal crossing, the railroad should construct its cattle guard along the line of highway, it is contended that in this case the railroad could not be held to do this, as a matter of law, because the highway and railroad were so located as to make it geographically impossible, and because of the impracticability and inconvenience attendant upon such construction.

(4) The court in its charge so submitted the case to the jury as to convey to them an erroneous impression as to the facts for their consideration, and the application of the rules of law upon which they acted in arriving at a verdict in favor of the plaintiff.

(5) The evidence showed the horse to be in the highway at the time it was struck by the train.

1. No time need be spent upon the question whether this State road, so called, was a legal highway. It is conceded to have been such by the plaintiff, but it is claimed that its width was a question for the jury.

There was evidence tending to show that it was at one time an old trail that had been cut out and used for years as a "tote" road, and that it was opened about 1873. We think that its width, depending upon the user and nonuser, was a question for the jury. In the case of *Coleman* v. *Railroad Co.*, 64 Mich. 160 (31 N. W. 47), it was held that a highway can be partially discontinued by nonuser, and stands, as against long (adverse) possession, no better than any other property, and a highway by nonuser only is measured as to its width by such use. In that case, as here, counsel cited the statute—the present section 4061, 2 Comp. Laws (2 How. Stat. [2d Ed.] § 2193) —and the fact was noted by the court that the clause in that statute making such roads 4 rods wide, was adopted in 1881, after the highway in question had become a public road by user. We think, therefore, that the question of

the width of the road was one for the jury, and that the court did not err in submitting the question to them.

2. Was the cattle guard properly located? This, we think, was also a question for the jury, and was properly submitted by the court in its charge to them. It would seem that the court must have had in mind the case of *Parker* v. *Railway Co.*, 93 Mich. 607 (53 N. W. 834). This was a highway crossing case, and the question presented was similar to the one we are considering. After referring to the statute providing for railway fences, Chief Justice McGRATH, speaking for the court, said:

"This statute evidently contemplates that railway tracks shall be exposed within the limits of the highway only. By exposing its right of way and tracks beyond the limits of the highway, the defendant had increased the danger, and rendered itself liable for damage occasioned thereby. *Andre* v. *Railroad Co.*, 30 Iowa, 107; *Railroad Co.* v. *Newbrander*, 40 Ohio St. 15; *Jeffersonville, etc., R. Co.* v. *Morgan*, 38 Ind. 190; *Fort Wayne, etc., R. Co.* v. *Herbold*, 99 Ind. 91."

There is evidence in the record that the cattle guard in question was laid at right angles with the railroad track, and was back about 115 feet from the crossing proper, and that no fence was maintained on the west side of the track for the entire distance of 115 feet, and that the only fence referred to was a private fence, several rods away from the railroad track, between the cattle guard and the highway proper, thus forming a pocket on what was, by plaintiff, claimed to be land belonging to the railroad company, no part of which was highway, unfenced and unguarded, into which the plaintiff's horse entered, and from which it came upon the track and was killed. We think it was a question of fact for the jury to determine where the boundary lines of the highway were.

3. Was the guard as near the highway as practicable? We think this was also a question for the jury, and was properly submitted to them.

4. Should the court have directed a verdict? We can-

not agree with appellant's counsel that only a question of law was presented. We think, as we have already said, that a question of fact was presented, and was properly submitted to the jury.

5. Was the horse in the highway when it was struck by the train? It is very evident that the horse was upon the railroad track when it was struck and killed by the train. Whether it was within the boundary of the highway proper was a question for the jury, and was answered by their verdict.

We find no reversible error in the record, and the judgment below is affirmed.

MOORE, C. J., and STEERE, MCALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred.